**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00307-CRC** |
| **v.** | : | |
| | : | |
| **ERIC V. VON BERNEWITZ,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the Government requests that this Court sentence Eric Von Bernewitz to 14 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

## I.    Introduction

The defendant, Eric V. Von Bernewitz, age 47, the owner of a furniture company and a wrestling club, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars of property damage.[1]  During that attack, he and his codefendant brother, Paul Von Bernewitz, crossed barriers on each side of the U.S. Capitol building and ultimately entered the temporarily closed building.

---

[1]    According to the Architect of the Capitol, the Capitol Police, the House Chief Administrative Office, the Secretary of the Senate and the Senate Sargent at Arms, as of March 2022, the costs incurred total $2,734,783.14.

Eric Von Bernewitz pleaded to a violation of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, Count Four of the Information.  *See* ECF Nos. 10, 35.  As explained herein, a sentence of 14 days, with supervision to follow, is appropriate in this case because: (1) the defendant was among the initial crowd who breached the metal barriers that prevented access to the closed west side of the U.S. Capitol building; (2) video shows that the defendant watched as rioters pushed past U.S. Capitol Police Officers at two metal barrier lines; (3) after this, the defendant and his brother observed people climbing up the electoral stage scaffolding on the west side of the U.S. Capitol building, yet they persisted and circled to the east side of the Capitol; (4) the defendant watched as people, including his brother, pushed against this police line, eventually breaking the line and surging up the east Capitol steps towards the Rotunda Doors; (5) he watched a rioter break windows and heard U.S. Capitol Police deploy flash-bangs and/or tear gas at the Rotunda Doors, yet he entered the U.S. Capitol building anyway, despite passing broken glass and hearing alarms; (6) he remained in the U.S. Capitol building for approximately 14 minutes; and (7) he minimized his own culpability in his interview with agents.

The Court must also consider that the defendant's conduct on January 6th, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. The defendant's participation in the riot, and facts unique to his case, support this recommended sentence.

## II.     Factual and Procedural Background

### *The January 6, 2021, Attack on the Capitol*

To avoid exposition, the Government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 37 ¶¶ 1-7 (Statement of Offense). As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

### Eric and Paul Bernewitz's Role in the January 6, 2021, Attack on the Capitol

Eric and Paul Von Bernewitz traveled together overnight from Virginia Beach, Virginia, to Washington, D.C., to attend former President Trump's speech on January 6, 2021. After attending speeches, they joined a large crowd marching toward the U.S. Capitol building, going with the crowd to metal barriers set up on the west side of the Capitol building. U.S. Capitol Police had set up temporary and permanent barricades around the exterior perimeter of the U.S. Capitol building, including the west-side lawn and the east-side plaza, in an attempt to keep the crowd away from the U.S. Capitol building, while members of the House and Senate and the Vice President followed the constitutionally prescribed process of certifying the results of the 2020 Presidential election. ECF Nos. 42 ¶ 14, 43 ¶ 14.

An open-source YouTube video captured Eric and Paul Von Bernewitz as they approached the first level of metal barriers, guarded by police, on the west side of the U.S. Capitol building. The Von Bernewitz brothers appear early in this video, within a large crowd that included a man on a bullhorn announcing: "This is our Capitol." The crowd then began chants of "1776." The brothers are highlighted in the screenshot below, with Eric on the left and Paul on the right:



Submitted Exhibit 1 at 1:50-2:15.[2]  The layers of fences were marked by white "AREA

CLOSED" signs that can be observed on the fencing in front of the brothers:



---

[2]      This is an open-source video that can be found at Metrospecial, "Insurrection at the
Capitol (Shooting Death) – Washington D.C. – Documentary Raw Footage," YouTube,
September 18, 2021:   https://youtu.be/V3KpiJzBM6M?t=121.

Exhibit 1 at 2:15.

The video skips the confrontation that led to the breach of these barriers, but the video does capture the crowd, including the Von Bernewitz brothers, rushing forward to the next layer of barriers, which were guarded by U.S. Capitol Police.  Exhibit 1 at 2:32-2:59.  At the second barriers, those at the front of the crowd turned violent, pushing and crashing their bodies into barriers while officers pushed from the other side:



Exhibit 1 at 2:55-5:30, 3:47.  Some rioters were even punching at officers, who were quickly overrun by the rioters.  *Id.*

Facebook video, submitted as Exhibit 2, shows that the brothers moved forward with other rioters to this second barrier and would have observed this breach:



Exhibit 2 at 00:30.[3]  Paul Von Bernewitz moved further forward than his brother Eric, stopping

yards from these second barriers where rioters struggled with police:



---

[3]     This video can also be found at Marcus Dean, "The initial barricade is overrun and people make their way to the second barricade," Facebook, January 6, 2021: https://www.facebook.com/deanm1134/videos/3647258548644742.

Exhibit 2 at 1:07.  This video also shows the breach at the second barriers and shows Paul Von

Bernewitz maneuvering around and/or over the barricades:



Exhibit 2 at 2:00-2:15.  An open-source photograph captured Paul Von Bernewitz crossing the

second barrier – having stepped over a fallen gate bearing an "AREA CLOSED" sign:



Roy_17, https://www.flickr.com/photos/49283984@N05/50823067161/.  In the meantime, Eric Von Bernewitz stayed back.  After these gates were breached, Eric Von Bernewitz went around the barriers, through the lawn, and met up with his brother.



Exhibit 2 at 1:50-1:56.  The crowd, including the Von Bernewitz brothers, are recorded surging towards the next layer of gates near the base of the west side Capitol steps. *Id.*

The Von Bernewitz brothers later told agents that they moved toward the west side of the U.S. Capitol building, then circled the building to the east side and video corroborates this. Footage from a French news reporter captured rioters breaching the metal barriers surrounding the east plaza of the U.S. Capitol building and joining rioters, like Eric and Paul Von Bernewitz, who had circled the building:



Exhibit 3: Laura Geisswiller, Bangumi French Media Company, January 6, 2021, at 3:00-4:20.

After the east plaza barriers were breached, U.S. Capitol Police fell back and formed a line at the base of the stairs below the Rotunda Doors to stop the advancing rioters.[4]  The reporter captured video of Paul and Eric Von Bernewitz moving quickly towards this police line and arriving before much of the crowd:



---

[4]      A description of the breach at the east-side barriers can be found at *United States v. Madison Pettit and Gabriel Burress*, 1:21-cr-00744-TJK, ECF 45 pp. 3-11.

Exhibit 3 at 4:40-4:50.  Both men ascended several stairs to within yards of the police line and appeared to enjoy the moment:



Exhibit 3 at 5:09.  Some rioters began to push police.  One individual shouted "back the blue" and asked people to "stand down" but others ignored this and shouted for rioters to charge and push.  Exhibit 3 at 5:10-6:10.  Eric and Paul Von Bernewitz both got very close to U.S. Capitol Police Officers on this stairway, as shown in this screen capture with the US Capitol Police Officer circled in red:



Exhibit 3 at 5:47.  Over a five-minute period, rioters pushed and shoved police officers in a clear

effort to get past the police line near at the base of the east steps:



Exhibit 3 at 5:30-10:30, 8:55-9:10.  During that time period, Paul Von Bernewitz did not engage officers directly.  From approximately three people back, he used his hands to support rioters in front of him as they engaged police:



Exhibit 3 at 5:45-6:10.  Later, Paul Von Bernewitz and dozens of other rioters, engaged in a lengthy and simultaneous push against this police line as a result of rioter's calls for the push:



Exhibit 3 at 9:55-10:30 (showing at least a dozen rioters pushing towards police in the identified

segment).  The police line broke immediately after the screen capture above.  Exhibit 3 at 10:18.

Another open-source YouTube video shows the same events, including Paul Von

Bernewitz's support of the effort to break through the police line by pushing:



*See* RFIRN, "Eastside Capital Building 1/6/21," YouTube, January 10, 2021,

https://youtu.be/ZjLvYqJ2-EM?t=981 at 16:00-19:20.  This video shows that Eric Von

Bernewitz remained further down the steps and did not appear to be involved in pushing:



*Id.* at 17:00-17:10.

Vastly outnumbered, U.S. Capitol Police were pushed aside and the rioters, including

Paul and Eric Von Bernewitz, ran up the stairs towards the Rotunda Doors.  In video, rioters are

heard to declare "victory" and began a "stop the steal" chant.  Exhibit 3 at 10:20-11:00.  Eric and

Paul Von Bernewitz were captured in the foreground seconds after the crowd ascended the

stairway:





Exhibit 3 at 10:55-10:58.

Rioters filled the steps and the area surrounding the Rotunda Doors.  Rioters began

chanting things such as "1776," "stop the steal," "our house," or shouting obscenities at officers.

*See* "Eastside Capital Building 1/6/21," YouTube,  https://youtu.be/ZjLvYqJ2-EM?t=701 at

11:41- 28:35 (showing the U.S. Capitol Police retreat to the steps, the eventual breach of those

steps, and the gathering near the Rotunda Doors).  Some rioters assaulted officers who were

guarding the Rotunda Doors as tear gas was deployed, with accompanying loud explosions, in

front of the door and rioters.  *Id.* at 37:00-38:00; *see also* Exhibit 3 at 38:30-42:30 (showing

assaults on U.S. Capitol Police Officers at the Rotunda Doors). Although they were in the area, the Von Bernewitz brothers cannot be identified in this video.

Apparently during this time—after the Von Bernewitzes ascended the east stairway but before they entered the U.S. Capitol building—they went to the side of the Rotunda Door and a public-source video captured Eric Von Bernewitz watching a rioter smash U.S. Capitol building windows before the vandal was arrested:



See *https://vimeo.com/503397722* at 19:44 - 20:35.  Both brothers later told agents that they observed this.

Eventually, rioters breached the Rotunda Doors and began making incursions into the U.S. Capitol.  *See* "Eastside Capital Building, YouTube, https://youtu.be/ZjLvYqJ2-EM?t=701 at 38:00–59:00; and *United States v. Michael Rusyn,* 1:21-cr-00303- ABJ, ECF 49 pp. 3-4 (describing the earliest breach of the Rotunda Doors.  Although the Von Bernewitz brothers were among the first to pass barriers on both the west side and east side of the U.S. Capitol

building, they were not early entrants through the Rotunda Doors.  Indeed, the doors had been

breached more than 30 minutes before the brothers entered the Capitol building.  A public-

source video captured Eric and Paul Von Bernewitz waiting to enter the U.S. Capitol building

through the Rotunda Doors —on which glass was shattered—as security alarms blared:



FNTV – FreedomNEWSTV, "REEL: The Capitol Siege – January 6th – RAW FOOTAGE,"

YouTube, January 18, 2021, at https://youtu.be/jBRJmnvFfo8 at 13:04-14:02 (following Eric

Von Bernewitz into the foyer to the Rotunda and capturing his face several times); ECF Nos. 37

p.4, and 38 p. 4 (admitting that they "walked past broken windows on doors that had been forced

open and U.S. Capitol alarms were audibly sounding.").  U.S. Capitol security video records

Eric's entry at approximately 3:02:54 pm, and shows Paul entering five seconds later:





Both men went immediately into the U.S. Capitol Rotunda, which was full of loud and chanting rioters, including someone blowing a horn:



*See* https://youtu.be/jBRJmnvFfo8 beginning at 14:04 (with Eric Von Bernewitz passing the camera at 14:20); ECF Nos. 37 p. 4, and 38 p. 4 (acknowledging the "large crowd that was loud with horns and chants" inside the Rotunda).  While inside the Rotunda, the Von Bernewitz brothers walked around for several minutes and Paul Von Bernewitz appeared to take a photo or video with his phone:



At approximately 3:06 pm, U.S. Capitol Police began forming a line to push rioters outside of the U.S. Capitol building. At that time, the Von Bernewitz brothers were along the wall, but close to police:



The brothers do not appear to have engaged police, and they moved towards the wall as U.S. Capitol Police continued to push rioters out of the Rotunda:



Video from inside the Rotunda shows that some rioters were physically resisting and even assaulting police.  *See* https://youtu.be/jBRJmnvFfo8 at 15:10-17:44. This video also shows that many rioters had been pepper sprayed prior to the Von Bernewitzes leaving the Rotunda:



*Id.* at 18:29–19:36.  Another open-source video captured the chaos as the Von Bernewitz brothers waited to exit the Rotunda Doors even as other rioters forcibly jammed their way into the building.  *See* Hunting Insurrrectionists, "East Main "Columbus" Doors 1:45 – 4:45 pm – 56 video Sync," YouTube, March 12, 2021, at https://youtu.be/z1gODZvbhqs?t=5265 (capturing the brothers passing directly in front of the camera at 1:27:45).

Security camera video shows that Paul and Eric Von Bernewitz left the U.S. Capitol building just before 3:17 pm, having spent nearly 14 minutes inside the building.  After leaving the building, they walked down the east-side steps away from the Rotunda Doors:



Capitol Hill Occupation Videos, January 6, 2021, at https://archive.org/details/capital-hill-occupy-ovfr-18/Capital+Hill+Occupy+-ovfr18.mp4 at 22:20-22:25.

### *Interview of Eric Von Bernewitz*

After January 6, 2021, the FBI received a tip from an acquaintance of Eric and Paul Von Bernewitz's sister. The tipster provided the FBI with Facebook posts by the defendants' sister stating that her brothers went inside the U.S. Capitol building on January 6, 2021.  She said that they observed "tear gas," chants of "stop the steal," took photos, and engaged her in FaceTime conversation from within the U.S. Capitol building.  Following this tip, the FBI attempted to contact Eric Von Bernewitz.  Shortly thereafter, on January 19, 2021, a lawyer for Eric Von Bernewitz called the FBI and told the FBI that both brothers went into the U.S. Capitol building and that his client, Eric Von Bernewitz, could be interviewed and would consent to a search of his cellular telephone.

That same day Eric Von Bernewitz went to an FBI office in Chesapeake, Virginia, and was interviewed with his lawyer participating by telephone.  Eric Von Bernewitz gave agents an accurate account of his location in and around the U.S. Capitol building on January 6, 2021, while minimizing some details.  Eric Von Bernewitz said that after watching President Trump's speech, he left with a "heavy" crowd and marched towards the U.S. Capitol building on the west side.  He told agents that when they approached the U.S. Capitol building, he saw that people "pushed away the gates – or what not" and indicated that "the police officers just kinda said 'ok' and let people through."  He indicated, when shown a map, that they crossed multiple layers of barriers.  As shown in the videos provided above, rioters violently overran these gates and police officers' decision to retreat could not have been reasonably interpreted as consent to enter the U.S. Capitol building.  *See* Exhibit 1 at 00:00-5:30; Exhibit 2 at 0:00-2:29.

Eric Von Bernewitz said that he saw people climbing the inaugural scaffolding and observed people "pushing" as they approached the U.S. Capitol building.  He indicated he and his brother did not stay on the west side but went around the U.S. Capitol building to the east side.  Eric Von Bernewitz never described the actions of rioters, including his brother, as they struggled to breach the U.S. Capitol Police line at the base of the east stairs.

Eric Von Bernewitz indicated that he did not witness the breach of the Rotunda Doors on the east side of the U.S. Capitol building.  He explained that "there might have been some stuff at the door, at the beginning, but I wasn't really close enough to see what was going on."  During the interview he acknowledged hearing "stun grenades" go off "a few times" and heard "loud noises in the crowd" and noticed "at one point that the doors were just open."

An FBI agent asked Eric Von Bernewitz the direct question, "nobody forced you into the building, right?" Eric Von Bernewitz hedged and did not want to acknowledge that he entered volitionally, saying:

> It was like a corral – so it's hard to remember exactly what happened – and when it happened, but it was like a corral, you know.  I don't know, at that point – I was talking to my brother, and I'll leave it at that - you know we were in a crowd and we had to go, you know, we had to go in that direction and I was like - I don't really remember whether we, you know, walked in, or had to walk in that direction or how that actually – it wasn't, um - it wasn't violent.

Open-source video, linked above, shows that Eric and Paul Von Bernewitz waited to enter the U.S. Capitol building and could have stayed outside.  *See* FreedomNEWSTV, https://youtu.be/jBRJmnvFfo8 at 13:03-14:03.  Security video also shows that the men did not try to get out of the Capitol once inside, but moved further into the building, from the foyer into the Rotunda.

Eric Von Bernewitz said that he could smell tear gas inside the Capitol building and described the other rioters as "chaotic."  He said that his brother took photographs while inside, but he did not because he had shut down his cell phone to preserve battery life.  When asked whether he knew his entry was wrong, Eric Von Bernewitz said he went in "peacefully protesting" but that "as soon as I got in there I wanted to get out," indicating that he recognized it was wrong.

Eric Von Bernewitz signed a consent form and his cell phone was copied during the interview.  His demeanor was very cooperative throughout the interview.  Through his attorney, he indicated that he understood that he could be charged for his conduct and would cooperate with any arrest and appearance. [5]

---

[5]    The Government has tried to present an objective account of the FBI interviews.  The two interviews were video recorded, and the Government will have the interviews available for Court review if the Court determines that any issue is an important controversy.

### *Cell Phone and Social Media Evidence*

The search of Eric Von Bernewitz's cell phone showed that Eric sent Paul a text message on January 5, 2021, telling him "get some sleep we'll leave at 2 am." On January 6, 2021, Eric Von Bernewitz sent another person a text message stating, "Paul and me breached the capital [sic] building." In text messages exchanged with another person, Eric wrote:

> We left the speech early and headed for the capital [sic]. We were having troubles hearing Trump. We were at [the] capital [sic] and saw all the breaches. It was pretty calm. Everyone was talking to the police and encouraging them to stand down and back the patriots. No real violence.

Text messages with two other individuals, between January 5 and 7, 2021, capture Eric Von Bernewitz sharing conspiracy messages, saying "[e]verything is playing out exactly how Q has told us it would play out." In these messages he shared beliefs about "mass assassinations," thousands of secret indictments, President Trump's intent to activate martial law, argued that "Biden, Pence and others" were already secretly arrested, and said that JFK Jr. was alive and would be the next President of the United States. On the morning of January 6, 2021, Eric explained that news about the Senate and Presidential elections were "a movie to show the idiots!" Later that day he sent the same group a message saying, "Paul and I breach the capital [sic]."

Agents reviewed Eric Von Bernewitz's Twitter feed and found similar sentiments. On November 23, 2020, Eric Von Bernewitz sent two tweets that together read:

> make us ill and control us. Everything we've learned in the system/school has all been part of the globalist plan to keep our perception in line with their goals. They have been lying to us our entire lives and they have been caught! It's time to fight, its time to round up the globalists and obtain the freedoms we fought for when America was created!

Agents did not uncover any other social media posts involving the riot in the U.S. Capitol building or threats of violence.

Agents also found that Eric Von Bernewitz's phone contained several photos and videos from January 6, 2021, but none were taken within the U.S. Capitol building. This lack of photographs, and the timing of text message evidence, was consistent with Eric Von Bernewitz's statement that he turned his phone off before entering the U.S. Capitol building.

### *The Charges and Plea Agreement*

On March 23, 2021, Eric and Paul Von Bernewitz were charged by Complaint with knowingly entering or remaining in any restricted building, and disorderly conduct on Capitol grounds, violations of 18 U.S.C. §§ 1752(a)(1), (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G). ECF 1. They were arrested the next day. ECF Nos. 5-6. On April 27, 2021, the United States charged the same crimes in an Information. ECF 10. Both men signed plea agreements and on January 20, 2022, both men entered a guilty plea to a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. ECF Nos. 35-36. In their plea agreements, they agreed to pay $500 in restitution to the Department of the Treasury. *Id.*

### III.    Statutory Penalties

The defendants now face a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and U.S. Probation, the defendants face up to six months of imprisonment and a fine of up to $5,000. The defendants must also pay restitution under the terms of their plea agreements. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). Because this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a short period of incarceration and probation.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through barriers and barricades, as proven here, and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air – also proven here. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should

look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had the defendant personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish the defendant from most other misdemeanor defendants.

Eric Von Bernewitz was in the crowd that overran, and even assaulted, officers on both sides of the U.S. Capitol building.  Although the video does not show him engaging in physical altercations with police, he was present when other rioters did.  He was there when rioters pushed and shoved police officers and police barriers and overcame law enforcement efforts to secure the west side of the U.S. Capitol building.  After reaching the U.S. Capitol building, he went around the building and through the process again on the east side, joining the mob that overran officers there.  On the east side, he does not appear to have pushed with rioters, like his brother Paul.  This is one reason we have requested that Eric Von Bernewitz be sentenced to 14 days' incarceration rather than the 45 days requested for his brother.

When the police line broke because of the large number of violent rioters, Eric Von Bernewitz surged up the steps with other rioters, arriving at the walls of the Capitol building. He admittedly heard the battle between officers and rioters at the Rotunda Doors, with loud bangs from tear gas deployment, and he even observed one rioter kicking out windows on the U.S. Capitol building, as shown in a video. After all of this, Eric Von Bernewitz entered the U.S. Capitol Building.

Eric Von Bernewitz was not pushed or "corralled" into the U.S. Capitol building, as he later suggested to investigators. He is observed to have waited for the chance to enter and deliberately maneuvered to get in, walking past broken windows and into blaring alarms. Once inside, he went into the Rotunda where he saw further confrontations between rioters and police who were again working to resist rioters. Eric Von Bernewitz supported all of the unlawfulness and violence through his presence. Accordingly, the nature and the circumstances of this offense establish the need for a sentence of incarceration and probation in this matter.

### B.  The History and Characteristics of the Defendant

Eric Von Bernewitz is in his mid-forties, and other than a DUI in 2004, he has only been convicted of minor traffic offenses. ECF 42 ¶¶ 27-55. His life has been affected by a severe accident, when he was a teenager, that required significant recovery and left his right arm permanently paralyzed. ECF 42 ¶ 72. He has two sons from two marriages and has the support of his spouse and family. ECF 42 ¶¶ 62-67. He appears to be a successful business owner and operates a wrestling club for youth. ECF 42 ¶¶ 81-93.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.

"The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and

appalling disregard for our institutions of government and the orderly administration of the democratic process."[6] Eric Von Bernewitz is complicit in the Capitol attack and showed a lack respect for law enforcement, government processes, and the rule of law, as he persisted past multiple barriers and into the Capitol building.  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6th riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes

---

[6]     Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf.

we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss

during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to
> attack the Capitol to prevent our elected officials from both parties from performing
> their constitutional and statutory duty, democracy is in trouble. The damage that
> [the defendant] and others caused that day goes way beyond the several-hour delay
> in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven

months ago for the United States and our diplomats to convince other nations to pursue democracy.

It means that it will be harder for all of us to convince our children and our grandchildren that

democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v.*

*Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have

recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a

manner that delays the certification of the election, throws our entire system of government into

disarray, and it undermines the stability of our society. Future would-be rioters must be

deterred.") (statement of Judge Nichols at sentencing).

　　The gravity of these offenses demands deterrence. This was not a protest.  *See United States*

*v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be

made defending what happened in the Capitol on January 6th as the exercise of First Amendment

rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—

especially those who intend to improperly influence the democratic process—that their actions

will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

　　Eric Von Bernewitz's conduct justifies an incarceration sentence and so does the need for

specific deterrence.  As stated above, he was in the first wave of rioters to overrun the barriers on

both sides of the Capitol.  Although he did not directly engage in violence, he was near violent conduct on multiple occasions, standing by casually while rioters clashed with police and smashed windows.  Rather than being deterred by this violence, he continued to press on and enter the Capitol building, where he observed additional clashes with police.

His minimization about the events of January 6 – suggesting that he was "corral[led]" into entering the Capitol and claiming that "it wasn't violent" – show the need for specific deterrents. He similarly downplayed the events of the day in a text message, where he claimed that "[i]t was pretty calm" and there was "[n]o real violence."

Eric Von Bernewitz's actions on January 6, 2021, show that he tolerated and even supported aggression towards law enforcement officers.  This is especially concerning in the context of his statement on Twitter that "[i]t's time to fight, it[']s time to round up the globalists and obtain the freedoms we fought for when America was created" and his expressed and messaged belief in wild conspiracy theories about mass killing and secret Presidential acts.  This reaffirms the need for incarceration, to accompany three years of probation, to effect specific deterrents.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the Government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress. Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6th riot in mind. [7]  Moreover, each offender's case will exist on a spectrum

---

[7]     Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not necessarily become the default.[8] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The defendant has pleaded guilty to an Information charging him with Parading, Demonstrating or Picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to

---

[8]     Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The Government is abiding by its agreements in those cases but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" (§ 3553(6)), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators.  In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id*.; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines

do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of the legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

The United States believes that the conduct of Eric Von Bernewitz on January 6, 2021, takes him out of the category of the least culpable misdemeanor defendants.  He participated in the Capitol breach in a structurally important way, being among the crowds of rioters who confronted police at several barriers, on both sides of the U.S. Capitol building, and overwhelmed them with force and numbers.  The United States has generally recommended (and judges have often imposed) jail time in cases where the defendant has been shown to be near or encouraged confrontations with law enforcement.  *See e.g.*, *United States v. Register*, 1:21;cr-00349-TJK (receiving 45 days incarceration where the defendant waved the crowd towards an access point, entered the U.S. Capitol past broken windows and over smashed glass, and ignored officers' attempts to clear him and others from the building, and witnessed violence); *United States v.*

*Gonzalez*, 1:21;cr-00115-CRC (receiving 45 days incarceration, 24 months' probation, and a $1000 fine, where the defendant was among the first wave of rioters to enter the U.S. Capitol building, observed violence between rioters and officers, left the Capitol only when forced by law enforcement, and distributed marijuana within the U.S. Capitol building).

In addition to the cases above, the Von Bernewitz brothers' conduct is significantly more aggravating than *United States v. Joshua and Jessica Bustle*, 1:21-cr-00238-TFH, who also entered the U.S. Capitol building through the Rotunda Doors approximately 30 minutes after they had been forced open.  Like the Bustles, Eric and Paul Von Bernewitz walked past broken windows and sounding alarms. The Bustles were likely within the Rotunda at the same time as Eric and Paul Von Bernewitz because they also had to leave the Rotunda because of the advancing police line that formed within the Rotunda.  Like the Von Bernewitz brothers, the Bustles did not destroy property and apparently did not make significant social media posts.

The conduct of Eric and Paul Von Bernewitz is substantially more serious, however, because of their support for the mob that broke through two barriers on the west side of the U.S. Capitol building and pushed through the police line on the east steps of the Capitol.  Simply put, the Bustles did not participate, in the way that the Von Bernewitz brothers did, in the effort to break through barriers, as shown within the video submitted with this memorandum.  Notably, the Court sentenced the Bustles to one and two months home detention, respectively, and 40 hours of community service, and two years' probation.  A more significant punishment, to include jail time, is appropriate here because Eric Von Bernewitz's conduct was more serious.

In *United States v. John Clarence Wilkerson IV,* 1:21-cr-00302-CRC, this Court sentenced Mr. Wilkerson to thirty-six months' probation based on Wilkerson's conduct in walking over fallen barricades, just after they had fallen, and watching rioters engage police at a police line.

Wilkerson then climbed through scaffolding and later entered the already breached U.S. Capitol building at the Senate Wing Door, after which he walked through the U.S. Capitol Building for fourteen minutes.  Like the defendants, Wilkerson contended that the crowd was mostly peaceful despite all the evidence to the contrary.

The conduct of Eric Von Bernewitz is more serious than *Wilkerson* because he was involved in temporally separate breaches on both sides of the U.S. Capitol building, thus showing his deliberate persistence. This is likely a distinction shared by very few rioters.  Thus, 14 days of incarceration for Eric Von Bernewitz is appropriate, in addition to three years of probation.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.      The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense.  *See* 18 U.S.C. § 3561(a)(3); *United*

*States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing a split sentence).

### A.      This petty offense may include both incarceration and probation.

#### 1.      Relevant Background

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today.  *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), codified at 18 U.S.C. § 3551 et seq.; *Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing).  That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment).  Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences."  Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided."  18 U.S.C. § 3551(a).  Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D."  18 U.S.C. § 3551(b).  As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment."  *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation."  As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense."  Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3).  In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense."  H.R. Rep. 102-405, at 167 (1991).  Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language.  See H.R. Rep. No. 103-711, at 887 (1994) (Conference Report).  In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

### 2.    Analysis

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases.  *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by

probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).   In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.   S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.   But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."   18 U.S.C. § 3561(a)(3).   Thus, for any federal offense other than a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).   *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."   18 U.S.C. § 3561(a)(3).   Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."   *Little*, 2022 WL 768685, at *4.   But that limitation "does not extend" to a defendant sentenced to a petty offense.   *See id.*

("[W]hile a defendant's sentence of a term of imprisonment may affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant is sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (*per curiam*). In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.* at 808. In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; see Cyclopedia of Federal Procedure, § 50:203, Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also Wright and Miller*, Federal Practice and Procedure, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense that is not petty.").

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense"). Section 3561(a)(3) does not state "the same offense or a different offense that is not a petty offense," which would imply that the final modifier—i.e., "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, Reading Law:

The Interpretation of Legal Texts 148 (2012).  Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited."  *Id.* at 148-49.  And while the indefinite article "a" might play that role in other contexts (e.g., "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense."  *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants.  *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense).  When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," see S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.  First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b).  *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one.").  As noted above, when Congress enacted the general prohibition on split

sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3).  That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases.  Scalia & Garner, supra, at 184.  In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Id.* This interpretation, moreover, "ensures that all of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls.  *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, supra, at 327-329.  Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185.  "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.*  Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning.  When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense

case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation). Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation). No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense. The defendant pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. *See* 18 U.S.C. § 19; see *United States v. Soderna*, 82 F.3d

1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years' probation).

> **B.** **A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.**

> **1.** **Relevant background**

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.  18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*

> **2.** **Analysis**

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time."  18 U.S.C. § 3653(b)(10).  Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of

probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the Government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improved or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the Government recommends that this Court sentence Eric Von Bernewitz to 14 days' incarceration, 36 months' of probation, 60 hours of community service and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:     /s/ Michael W. Mitchell
        MICHAEL W. MITCHELL
        Assistant United States Attorney
        Detailed to the District of Columbia
        Texas Bar No.  24037126
        555 4th Street, N.W.
        Washington, D.C. 20530

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the forgoing motion was served upon counsel of record through ECF on the date of filing, this the 19th day of April, 2022.

By:    /s/ *Michael W. Mitchell*
        MICHAEL W. MITCHELL
        Assistant United States Attorney
        Detailed to the District of Columbia
        Texas Bar No.  24037126
        555 4th Street, N.W.
        Washington, D.C. 20530